

**ATTORNEYS FOR APPELLANT**

Matthew D. Barrett
Matthew D. Barrett, P.C.
Logansport, Indiana

Bradley A. Rozzi
Hillis Hillis Rozzi & Knight
Logansport, Indiana

**ATTORNEYS FOR APPELLEE**

Gregory F. Zoeller
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Loren H. Fry,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | February 4, 2015<br><br>Court of Appeals Cause No.<br>09A05-1404-CR-178<br><br>Appeal from the Cass Superior Court.<br>The Honorable Rick Maughmer,<br>Judge.<br>Cause No. 09D02-1109-MR-2 |

**Sharpnack, Senior Judge**

## Statement of the Case

[1]     A jury determined that Loren H. Fry shot and killed his neighbor David

Schroder.  Fry appeals his conviction of murder, a felony.  Ind. Code § 35-42-1-

1 (2007).  He challenges the trial court's evidentiary rulings, the prosecutor's

conduct during trial, the denial of his motions for directed verdict, and the court's rejection of one of his proposed jury instructions. We affirm.

## Issues

Fry raises four issues, which we expand and restate as:

> I. Whether the trial court abused its discretion in admitting evidence obtained from a search of Fry's house.

> II. Whether the trial court abused its discretion in admitting a witness's demonstration of how Fry's revolver was loaded and unloaded.

> III. Whether the prosecutor committed misconduct.

> IV. Whether the trial court erred in denying Fry's motions for directed verdict.

> V. Whether the trial court abused its discretion in rejecting Fry's proposed jury instruction.

## Facts and Procedural History

Loren Fry and David Schroder were neighbors in rural Cass County. They lived along County Road 275, near a hog farm. Schroder leased portions of his property for farming. He experienced a drainage problem that caused parts of his land to flood on occasion, which hindered farming. The problem was caused by conditions on Fry's property. Schroder and Fry disagreed about how to correct the flooding, and they both hired attorneys in relation to the matter. The dispute was ongoing at the time of Schroder's death.

[4] On several occasions prior to Schroder's death, visitors to Schroder's property saw Fry drive past, going as slow as fifteen miles per hour, looking at Schroder and his visitors. On other occasions, Fry would drive an off-road vehicle to the boundary between his property and Schroder's property and sit there for up to half an hour while staring at Schroder's house. In addition, Schroder and Fry would "follow each other up and down" County Road 275 as often as "once a week." Tr. p. 161. "You'd see one drive by and then the other one would go and see what the other one was doing." *Id.* at 831. One of Schroder's sons advised Schroder to stay away from Fry.

[5] On the afternoon of September 20, 2011, Steve Swartzell delivered fuel to Schroder's house. According to his truck's electronic records, he finished pumping the fuel at 12:34 p.m. When Swartzell finished, Schroder was standing nearby, and the two talked for fifteen to twenty minutes. As they talked, Fry drove by in a blue truck. He slowed down to "five to ten" miles per hour and stared at Schroder and Swartzell as he drove by. *Id.* at 356.

[6] Andrew Rusk worked at the hog farm that was located near Schroder's and Fry's houses. Brian Stoneking was Rusk's supervisor. During the time period relevant to this case, Rusk lived with Jessica Malchow in a house on the farm's property, along County Road 275. Rusk, Malchow, and Stoneking were familiar with Schroder and Fry.

[7] Early on the afternoon of September 20, 2011, Rusk was working with Stoneking in a hog barn. They saw Schroder drive up to the barn in a white

truck. After several minutes, Fry drove by on County Road 275, traveling in the same direction Schroder had been traveling. Schroder drove after Fry, keeping "a telephone pole or two" of distance between them. *Id.* at 233. They were driving thirty-five to forty-five miles per hour.

[8]     A few minutes later, Fry drove back by the barn, going in the opposite direction. Schroder followed him and was "shaking his index finger" at Fry. *Id.* at 233. Next, Stoneking and Rusk finished loading hogs into a tractor-trailer, and Stoneking drove to another building on the farm. As he drove, he saw Schroder's truck parked on County Road 275. Stoneking saw Schroder's truck again, in the same location, six minutes later. *Id.* at 338. To Stoneking, the situation did not "look right. It looked like something happened." *Id.* at 305. Five to six minutes later, he saw a tractor towing a trailer driving down County Road 275. He recognized the tractor as belonging to Sam Snyder.

[9]     During this same time period, Malchow was sitting in the front room of her house. She saw Schroder and Fry drive by on County Road 275. A few minutes later, she saw them drive by again, going in the opposite direction. Later, Malchow saw a man she recognized as Brandon Snyder drive a tractor towing a trailer down County Road 275. She did not see any other vehicles on the road during this time frame.

[10]    Brandon Snyder, who was Sam Snyder's nephew, was driving his uncle's tractor and trailer on County Road 275 to a field. He passed the hog farm and encountered a white truck on the side of the road. He looked down into the

truck and saw a man slumped over. Snyder got out of the tractor and walked over to the truck. The truck's engine was running. Snyder recognized Schroder and poked Schroder through the open driver's side window, asking if he needed help. There was no response, so Snyder went around to the passenger side and saw that Schroder had a wound to his head and was bleeding. Snyder called 911. Snyder did not see anyone else on County Road 275 from the time he began driving on it to the point where he encountered Schroder's truck.

[11] Police records reflect that Snyder's call was received at 1:57 p.m. Police, paramedics and the coroner arrived at the scene. The coroner determined that Schroder had two gunshot wounds to the head and was dead. Schroder's wallet, which contained $165, was still in his pocket. A crime scene investigator found a bullet fragment in Schroder's hat. Officers searched nearby buildings and saw no sign of criminal activity. Schroder's truck was located no more than "three football fields" from Fry's house. *Id.* at 1096.

[12] The police obtained a search warrant for Schroder's house but found no signs of criminal activity there. After further investigation, the police obtained a search warrant for Fry's property. They executed the warrant shortly after midnight on September 21, 2011. A team of police officers surrounded Fry's house, and the Cass County Sheriff ordered him to come outside, unarmed. Fry came out only after the sheriff ordered him to do so "five or six times." *Id.* at 658. Officers handcuffed Fry and took him to jail. At the jail, an officer searched Fry and discovered three .22 magnum bullets on his person.

[13] The officers did a "quick walk through" of Fry's house after taking him into custody but decided to delay a full search until the morning. *Id.* at 506. During the full search, officers saw letters related to Schroder and Fry's drainage dispute on the dining room table. In addition, they found a cubby hole in a wall near an exterior door, specifically the door that Fry used to leave the house when the sheriff directed him to come out. The cubby hole was two feet deep. An officer searched the hole and found a .22 magnum Ruger revolver in a holster, concealed beneath clothing, dirty Styrofoam plates, and paper shooting targets.

[14] Elsewhere in the house, the officers found packaging for the revolver, a receipt from a gun store reflecting the purchase of the revolver, and bullets for the revolver. The revolver had a six-bullet capacity, and it contained four bullets and two empty shells. Thus, the gun had been fired twice. The officers found several other guns in Fry's home. None of them were in the hole with the revolver. The revolver was the only gun in the house that could have fired the bullets that the police had found on Fry's person the previous night.

[15] An autopsy revealed that both bullets went through Schroder's brain, and either wound would have been fatal. One shot went through the head, resulting in the bullet fragment that was found in Schroder's hat. The other shot did not have a corresponding exit wound, so a second bullet fragment was recovered from Schroder's skull.

[16] Both bullet fragments, Fry's .22 magnum Ruger revolver, and the bullets found in the revolver were submitted for forensic testing. The examiner stated that the revolver could not be conclusively identified as the gun that was used to shoot Schroder, but it could not be excluded either.

[17] The State charged Fry with murder. Fry requested bail, and the trial court denied his motion. Our Supreme Court affirmed the trial court's decision on interlocutory review. *Fry v. State*, 990 N.E.2d 429, 451 (Ind. 2013).

[18] Next, Fry filed a motion to suppress all evidence obtained as a result of the search warrant. The court denied Fry's motion after a hearing. Fry sought interlocutory review of the court's denial. A panel of this Court denied Fry's motion for interlocutory review.

[19] At trial, Fry raised a continuing objection to all evidence obtained as a result of the search warrant. The trial court admitted into evidence photographs of Fry's revolver but declined to admit the actual gun. Fry filed a motion for directed verdict after the State rested. The court denied Fry's motion. Fry renewed his motion for directed verdict after he presented his case. The court denied that motion. The jury determined that Fry was guilty of murder, and the court sentenced him accordingly. This appeal followed.

# Discussion and Decision

## I. Admission of Evidence Obtained From Search Warrant

[20] Fry contends that the evidence the State obtained from the search of his house is inadmissible. He frames the issue as whether the court erred by denying his motion to suppress. Because Fry seeks appellate review after a conviction, the issue is more appropriately framed as whether the trial court properly admitted the evidence at trial. *Jackson v. State*, 908 N.E.2d 1140, 1142 (Ind. 2009). A trial court has broad discretion in ruling on the admissibility of evidence and we will disturb its rulings only where it is shown that the court abused that discretion. *Halliburton v. State*, 1 N.E.3d 670, 675 (Ind. 2013). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id.*

[21] To be valid, a warrant must comply with the Fourth Amendment prohibition on unreasonable searches and seizures, as well as with Indiana constitutional and statutory law. *Gray v. State*, 758 N.E.2d 519, 521 (Ind. 2001). The statute that governs search warrants provides, in relevant part:

> no warrant for search or arrest shall be issued until there is filed with the judge an affidavit:
>
> (1) particularly describing:
>
> (A) the house or place to be searched and the things to be searched for; or
>
> (B) particularly describing the person to be arrested;

(2) alleging substantially the offense in relation thereto and that the affiant believes and has good cause to believe that:

(A) the things as are to be searched for are there concealed; or

(B) the person to be arrested committed the offense; and

(3) setting forth the facts then in knowledge of the affiant or information based on hearsay, constituting the probable cause.

Ind. Code § 35-33-5-2 (2005).

[22] When an appellant challenges a search warrant, we determine whether the issuing magistrate had a substantial basis to issue the warrant. *Jones v. State*, 783 N.E.2d 1132, 1136 (Ind. 2003). We determine the existence of a substantial basis by considering whether reasonable inferences drawn from the totality of the evidence support the determination. *Gray*, 758 N.E.2d at 521. We give significant deference to the magistrate's determination. *Houser v. State*, 678 N.E.2d 95, 99 (Ind. 1997). Probable cause means a probability of criminal activity, not a prima facie showing. *Seltzer v. State*, 489 N.E.2d 939, 941 (Ind. 1986).

### *A. Hearsay*

[23] Fry first contends that the magistrate should not have issued the warrant because the State's request was based on uncorroborated hearsay. Indiana Code section 35-33-5-2 provides that when a State's request for a search warrant is based on hearsay, the request must either:

(1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or

(2) contain information that establishes that the totality of the circumstances corroborates the hearsay.

[24] The trustworthiness of hearsay for the purpose of proving probable cause can be established in several ways, including showing: (1) the witness has given correct information in the past, (2) independent police investigation corroborates the informant's statements, (3) the basis for the witness's knowledge is demonstrated, or (4) the informant predicts conduct or activity by the suspect that is not ordinarily easily predicted. *Smith v. State*, 982 N.E.2d 393, 405 (Ind. Ct. App. 2013), *trans. denied*. These examples are not exclusive. *Id.*

[25] Here, a judge pro tempore held a recorded hearing on the State's request for a search warrant. Detective Sergeant Brad Sommers of the Cass County Sheriff's Department testified that he had spoken with Schroder's sons and daughters-in-law, and that Fry was the first person they suspected of the murder because of "ongoing arguments." Appellant's App. p. 31. Fry argues that the State submitted no evidence to establish the credibility of Schroder's family. To the contrary, Sommers testified that he learned from his discussions with the family that Schroder received mail "this past Saturday" from Schroder's attorney regarding the dispute between Schroder and Fry. *Id.* at 39. He thus demonstrated that Schroder's family had a basis for knowing about the dispute.

[26] Sommers also testified at the probable cause hearing that he had interviewed Rusk and Malchow, who provided recorded statements. Sommers told the court that they saw Fry and Schroder drive up and down County Road 275 shortly before Schroder was found dead, and that Malchow had not seen anyone else on the road during that time period. Fry argues that Rusk and Malchow's statements are uncorroborated hearsay. Fry's argument is incorrect, because the witnesses were interviewed separately, but their statements corroborate each other.

[27] Fry further argues that Rusk's and Malchow's statements contradicted each other as to timing, and he concludes that their statements are thus unreliable hearsay. We disagree. Sommers testified that both witnesses told him that their estimates on timing were inexact. Rusk thought that he first saw Schroder at 2:00 p.m., but he said it was an estimate because he was not wearing a watch. Malchow said she looked at a clock when she saw Fry and Schroder drive by, but she conceded that Rusk set the clock to run early by an unknown span of time. Thus, the reviewing magistrate was made aware that the timing was not exact, and he questioned Sommers about the chronology in detail before issuing the warrant. Furthermore, Rusk's and Malchow's description of events corroborated each other, regardless of their timing.

[28] Fry cites several cases in support of his claim of lack of corroboration. *Bradley v. State*, 609 N.E.2d 420 (Ind. 1993); *Methene v. State*, 720 N.E.2d 384 (Ind. Ct. App. 1999); *Bryant v. State*, 655 N.E.2d 103 (Ind. Ct. App. 1995). Those cases

are distinguishable because they involve confidential informants or anonymous tipsters, and in this case all of the witnesses were identified.

[29] Next, Fry contends that Sommers lied during the probable cause hearing, thereby invalidating the search warrant. Specifically, Sommers testified that Malchow told him that the clock she used to tell time on the day in question "may be off by a half hour or more. She doesn't really know. She knows it's at least a half hour or more." *Id.* at 42. Fry says that Malchow never gave an estimate of how fast the clock was running. The portion of Malchow's recorded statement in which she discusses the timing of the clock contains several portions marked "indiscernible." *Id.* at 102. A defendant bears the burden of demonstrating the invalidity of a warrant. *Rios v. State*, 762 N.E.3d 153, 157 (Ind. Ct. App. 2002). During the hearing on Fry's motion to suppress, he conceded that he did not "have any evidence that [Sommers] intentionally" lied to the court. Tr. pp. 58-59. We cannot conclude that Fry has demonstrated that Sommers misled the magistrate.

[30] We conclude that the State properly corroborated the hearsay evidence it submitted in support of its request for a search warrant for Fry's home.

## B. Nexus between Evidence of a Crime and Fry's Home

[31] Fry also argues that the State failed to demonstrate during the probable cause hearing that evidence of a crime would be found at his house. In deciding whether to issue a search warrant, the issuing magistrate must make a practical, commonsense decision whether there is a fair probability that evidence of a

crime will be found in a particular place. *Allen v. State*, 798 N.E.2d 490, 495 (Ind. Ct. App. 2003).

[32] Here, Sommers testified during the probable cause hearing that (1) Fry and Schroder had been feuding; (2) Schroder shook his finger at Fry as they drove by the hog farm for a second time; (3) Fry was the last person to see Schroder alive and was near the scene of the murder; (4) Schroder had been shot to death; (5) no one else was on the road around the time Schroder was killed; and (6) Fry's home was a quarter of a mile from the crime scene. This evidence provides a substantial basis for the court to conclude that Fry was a suspect in Schroder's death and that a fair probability existed that the gun used to commit the murder could be found at Fry's home. *See Allen*, 798 N.E.2d at 496 (eyewitness testimony and police investigation revealed sufficient evidence for the magistrate to conclude that there was a fair probability that firearms would be found at the suspect's home).[1]

[33] The trial court did not abuse its discretion in admitting into evidence the items discovered as a result of the search of Fry's home.

---

[1] The parties also discuss whether, if the search warrant was issued without probable cause, the good faith exception to the warrant requirement applies here. We do not need to address the good faith exception due to the manner in which we have resolved Fry's challenge to the issuance of the search warrant.

# II. Admission of Demonstration with Fry's Revolver

[34] Fry asserts that the trial court should not have permitted the State to direct a witness to demonstrate for the jury how to load and unload Fry's revolver, alleging that the demonstration was both irrelevant and unduly prejudicial. However, during trial Fry cited only Indiana Evidence Rule 402, which governs relevance. Tr. p. 1151. A party may not object on one ground at trial and raise a different ground on appeal. *White v. State*, 772 N.E.2d 408, 411 (Ind. 2002). We thus limit our analysis to relevance and disregard Fry's arguments and citations to authority on the issue of unfair prejudice.

[35] Demonstrative evidence is evidence offered for purposes of illustration and clarification. *Wise v. State*, 719 N.E.2d 1192, 1196 (Ind. 1999). To be admissible, the evidence need only be sufficiently explanatory or illustrative of relevant testimony to be of potential help to the trier of fact. *Id.* Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action. Ind. Evid. Rule 401. We review the admission of evidence for an abuse of discretion. *Halliburton*, 1 N.E.3d at 675.

[36] During the State's presentation of its case, the court admitted into evidence a photograph of Fry's .22 caliber Ruger revolver but declined to admit the actual handgun. During Fry's presentation of his case, he asked Doug Downham, a local gun shop owner, to testify about his past interactions with Fry and about his knowledge of firearms and ammunition. Downham stated that he was

familiar with the .22 caliber revolver manufactured by Ruger, including its parts and how it is loaded and unloaded. The following exchange occurred:

> FRY: So is there a lot more labor involved in either loading or unloading a Ruger single six than there is a conventional handgun?
>
> DOWNHAM: Several times longer. Extensively in a situation to reload, yes. The single action revolver requires a lot more time.

Tr. p. 1141.

[37] Downham concluded, in response to Fry's questions, that owners of revolvers such as Fry's tend to leave them partially loaded due to the greater difficulty in loading and unloading them. On cross-examination, the prosecutor showed Downham Fry's .22 caliber Ruger revolver and asked him to show how it is fired. Over Fry's relevancy objection, the court permitted Downham to demonstrate for the jury how to load and unload the revolver.

[38] We conclude the demonstration was relevant. The State attempted to prove, through circumstantial evidence, that Fry used the .22 caliber Ruger revolver to murder Schroder. When the revolver was found, it contained four bullets and two empty shells. Although a forensic examiner could not conclusively prove that the revolver was used in the shooting, it also could not be ruled out, and there is a link between the two empty shells and Schroder's two wounds.

[39] Furthermore, the demonstration was sufficiently illustrative of Downham's testimony. He testified on direct examination that because loading and unloading the revolver is relatively difficult, gun owners tend to leave them

partially loaded.  The demonstration showed the jury how the loading and unloading process works and allowed them to judge the truth of Downham's testimony.  The trial court did not abuse its discretion.  *See Benner v. State*, 580 N.E.2d 210, 213 (Ind. 1991) (no abuse of discretion in allowing State's witness to display to jury handguns found in the defendant's home).

## III. Prosecutorial Misconduct

[40] Fry argues that the prosecutor engaged in misconduct by (1) having Downham display the .22 caliber Ruger revolver to the jury during cross-examination even though the gun was not admitted into evidence and (2) arguing during closing arguments, without evidentiary support in the record, that the revolver was the murder weapon.

[41] Fry concedes that he did not object to the prosecutor's comments during closing argument.  In addition, the record reflects that he did not object on grounds of prosecutorial misconduct during Downham's demonstration.  To preserve a claim of prosecutorial misconduct, the defendant must request an admonishment at the time the alleged misconduct occurs and, if further relief is desired, move for a mistrial.  *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014).  Fry has procedurally defaulted his claims of prosecutorial misconduct.

[42] If a defendant has waived a claim of prosecutorial misconduct but wishes to raise it on appeal, the defendant must establish not only the grounds for prosecutorial misconduct but must also establish that the misconduct constituted fundamental error.  *Id.* at 667-68.  When addressing a claim of

prosecutorial misconduct, we determine (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected. *Coleman v. State*, 946 N.E.2d 1160, 1166 (Ind. 2011). When the alleged misconduct concerns the prosecutor's arguments to the jury, we measure the gravity of peril by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. *Ryan*, 9 N.E.3d at 667.

[43] Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to make a fair trial impossible. *Id.* at 668. In evaluating the issue of fundamental error, our task is to look at the alleged misconduct in the context of all that happened and all relevant information given to the jury—including evidence admitted at trial, closing argument, and jury instructions—to determine whether the misconduct had such an undeniable and substantial effect on the jury's decision that a fair trial was impossible. *Id.*

[44] In this case, the prosecutor's conduct did not amount to misconduct. The bullets and empty shells in the revolver were relevant to the question of whether the revolver was the murder weapon, and Downham testified on direct examination that such revolvers were more difficult to load and were typically left partially loaded. On cross-examination, the prosecution acted within its rights to have Downham demonstrate how the gun was loaded to test his claim

that revolvers were more difficult to load. There is no evidence that the prosecutor asked for the demonstration to "inflame the jury," as Fry asserts. Appellant's Br. p. 34.

[45] In addition, the prosecutor's statements about the revolver during closing arguments were based on the evidence presented at trial. The trial court admitted into evidence a photograph of the revolver and witness testimony about where it was found and its condition. The State made an argument based on properly admitted circumstantial evidence that the revolver was the murder weapon. *See Coleman*, 946 N.E.2d at 1167 (prosecutor's comment on witness's statement was based on evidence admitted at trial). Fry has failed to establish misconduct, let alone fundamental error.

## IV. Denial of Motions for Directed Verdict

[46] Fry asserts that the trial court should have granted his motions for directed verdict because the State failed to provide sufficient evidence to convict him of murder.

[47] Indiana Trial Rule 50(a) provides, in relevant part, "Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence . . ., the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict." Our review of the denial of a motion for directed verdict or judgment on the evidence is essentially the same as review of a claim of insufficient evidence to support a conviction. *Pavlovich v. State*, 6 N.E.3d 969, 980 (Ind. Ct.

App. 2014), *trans. denied*. We do not reweigh the evidence or judge the credibility of the witnesses. *Delarosa v. State*, 938 N.E.2d 690, 697 (Ind. 2010). We consider only the probative evidence and reasonable inferences supporting the verdict. *Id.* We affirm if the probative evidence and reasonable inferences could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.*

[48] Fry asserts that there is insufficient evidence to prove that he murdered Schroder. A conviction for murder may be sustained on circumstantial evidence alone if that circumstantial evidence supports a reasonable inference of guilt. *Lacey v. State*, 755 N.E.2d 576, 578 (Ind. 2001).

[49] Schroder and Fry had a strained relationship due to the flooding on Schroder's property, which was caused by conditions on Fry's property. In addition, Fry frequently drove by Schroder's property or went to the property line that divided their lands and watched Schroder and his guests. One of Schroder's sons had advised him to stay away from Fry.

[50] On the day of Schroder's murder, Fry drove past Schroder's property and stared at Schroder and Swartzell. In addition, several witnesses saw Schroder following Fry on County Road 275 immediately before Schroder's murder. Schroder was wagging his finger at Fry. No other vehicles traveled on that road during that time period, and a police search of the area failed to reveal any signs that someone else had been present. In addition, no one took Schroder's phone or wallet, so the evidence weighs against robbery as a motive.

When the police executed the search warrant later that night, Fry had three .22 caliber bullets on his person. During a search of his house the following day, officers found papers related to the drainage dispute on Fry's kitchen table. They also found a .22 caliber Ruger revolver hidden in a cubby hole by the door through which Fry had left the house to surrender to the police. The revolver was the only gun Fry owned that could have fired the bullets the police found on his person. Forensic testing could not conclusively establish that the revolver was used to kill Schroder, but the revolver could not be ruled out either. Schroder had been shot twice, and the revolver had two spent shells in the cylinder. Fry owned other guns, but most of them were openly displayed in the house, and the revolver was the only gun hidden in the cubby hole.

This circumstantial evidence is sufficient for a reasonable finder of fact to conclude beyond a reasonable doubt that Fry had the opportunity, means, and motive to kill Schroder. *See Lawrence v. State*, 959 N.E.2d 385, 390 (Ind. Ct. App. 2012) (circumstantial evidence sufficient to prove defendant killed the victim because he was present at the time of the murder and had a motive to shoot the victim), *trans. denied*; *Ware v. State*, 859 N.E.2d 708, 724 (Ind. Ct. App. 2007) (evidence was sufficient to establish defendant was the shooter even though the gun was never found and no one saw him shoot the victim; witness testimony placed defendant at the scene and he had a motive to kill), *trans. denied*.

Fry argues that Malchow, Rusk, and Stoneking contradicted each other and themselves as to the timing of their observations of Fry and Schroder.

Although their timing may have differed, they did not waver in what they had observed. We conclude any differences in their perceptions of time were for the jury to resolve. *See Ware*, 859 N.E.2d at 724 (timing questions did not render evidence insufficient). The trial court did not err in denying Fry's motions to dismiss.

## V. Jury Instruction on Mere Presence

[54] Fry contends the trial court erred by rejecting his tendered jury instruction. The manner of instructing a jury lies largely within the discretion of the trial court, and we will reverse only for an abuse of discretion. *Henson v. State*, 786 N.E.2d 274, 277 (Ind. 2003). In determining whether a trial court abused its discretion by declining to give a tendered instruction, we consider (1) whether the tendered instruction correctly states the law, (2) whether there was evidence presented at trial to support giving the instruction, and (3) whether the substance of the instruction was covered by other instructions that were given. *Id.* Our Supreme Court has at times rephrased the second element as whether there was evidence to "render the instruction applicable to the issues." *Hoskins v. State*, 737 N.E.2d 383, 385 (Ind. 2000).

[55] In this case, Fry tendered a jury instruction that stated, "Mere presence at the scene of the crime is not sufficient to establish that the accused committed the charged crime." Appellant's App. p. 160. The trial court, after reviewing the authorities that Fry cited in support of the proposed instruction, stated that the instruction "seems to me to be just an accomplice liability instruction and not

an instruction that is an appropriate one given the facts that have been presented." Tr. p. 1175.

[56] We agree that the proposed instruction is not justified by the evidence presented at trial or, as our Supreme Court has stated, that the instruction is not "applicable to the issues." *Hoskins*, 737 N.E.2d at 385. As a general rule, juries are instructed that a defendant's mere presence is insufficient to establish guilt in cases involving accomplice liability. In fact, both of the cases Fry cited to the trial court in support of his instruction address accomplice liability. *Townsend v. State*, 934 N.E.2d 118 (Ind. Ct. App. 2010), *trans. denied*; *Alvies v. State*, 905 N.E.2d 57 (Ind. Ct. App. 2009). The doctrine of accomplice liability is inapplicable here because the State did not charge Fry as an accomplice or allege that he worked with an accomplice.

[57] Fry argues that without this instruction, the jury was at risk of being misled into convicting him based upon his mere presence on the scene near the time when Schroder was killed, particularly because there was no corroborating forensic evidence. To the contrary, the State presented a wide array of circumstantial evidence. Some of the evidence related to events occurring before the day of the murder and other evidence was discovered after the murder. Although the State presented a great deal of evidence on Fry's activities immediately prior to the murder, it did not argue that the mere presence alone required a finding of guilt. The evidence did not require giving the proposed instruction, and the trial court did not abuse it discretion in rejecting it. *See Hoskins*, 737 N.E.2d at 385 (no error in denying defendant's proposed instruction that he lawfully

possessed a firearm in his house because he was not charged with unlawful possession and the State never alleged any improprieties in his possession of the firearm).

# Conclusion

[58]  For the reasons stated above, we affirm the judgment of the trial court.

[59]  Affirmed.


May, J., and Bradford, J., concur.