## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 31 2019, 9:13 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Rory Gallagher
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Corey Nickles Morris,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | May 31, 2019<br><br>Court of Appeals Case No.<br>18A-CR-1264<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Alicia Gooden, Judge<br><br>Trial Court Cause No.<br>49G21-1502-F2-5941 |

**Pyle, Judge.**

# Statement of the Case

Corey Morris ("Morris") appeals his convictions and adjudication as an habitual offender. Morris argues that: (1) the trial court abused its discretion by admitting certain evidence obtained following the execution of a search warrant and an investigative stop, maintaining that the search warrant affidavit lacked probable cause and the investigative stop lacked reasonable suspicion; and (2) the trial court erred by allowing the State to refile an habitual offender enhancement. Concluding that the trial court did not abuse its' discretion and that Morris has waived review of his habitual offender enhancement argument, we affirm the trial court.

We affirm.

# Issues

1. Whether the trial court abused its discretion by admitting certain evidence.

2. Whether Morris waived review of his habitual offender enhancement argument.

# Facts

Between January 11, 2015 and February 14, 2015, an undercover detective and member of a multi-agency Indianapolis Metropolitan Drug Task Force ("Undercover Detective") purchased heroin from an unwitting individual ("Unwitting Individual"), known to be able to secure heroin, and Morris on four separate occasions. The first heroin purchase occurred between January

11, 2015 and January 13, 2015. During this purchase, Undercover Detective contacted Unwitting Individual. They met in a parking lot and Unwitting Individual called his/her source for heroin. Shortly thereafter, a black Ford Escape with a New York license plate driven by a black male arrived. Unwitting Individual walked directly to the Escape, got inside for short amount of time, and then after exiting, walked directly back to the vehicle where Undercover Detective was waiting. After Unwitting Individual left the Escape, the vehicle immediately departed and was followed by police surveillance units to the area of 62nd Street and Coffman Road, where the surveillance was ultimately terminated.

[4] Approximately ten days later, Detective Randall Dings ("Detective Dings"), who was with the Hamilton County Sheriff's Department and a member of the multi-agency drug task force, was in the area of 56th Street and Georgetown Road when he saw the same black Ford Escape from the first heroin purchase. He observed a black male driving the vehicle. Detective Dings followed the vehicle to a condominium complex near 62nd Street and Coffman Road, where it parked in an open garage connected to the residence of 4837 Shallow Water Place ("the Condo"). Detective Dings then observed the male driver walk from the garage to the front door of the Condo.

[5] Between January 23, 2015 and January 25, 2015, Undercover Detective arranged a second heroin purchase from Unwitting Individual. The same black Escape driven by a black male again arrived to meet Unwitting Individual. Unwitting Individual informed Undercover Detective that the driver of the

Escape was his/her source for heroin. After Unwitting Individual exited the Escape, it immediately left the area.

[6] For heroin purchase number three, law enforcement surveilled the Condo before the purchase. They saw the Escape driven during the first two purchases. The officers also observed the garage door of the Condo open, and a black male wearing a multi-colored shirt standing in the garage. After Unwitting Individual made the call, surveillance observed the black male walk from the garage area and enter the front passenger seat of a black truck. Law enforcement followed the black truck from the Condo to the parking lot where Undercover Detective and Unwitting Individual were waiting to make a purchase. Unwitting Individual advised Undercover Detective that anytime "he/she sees the guy with dreads that is the same source of supply as buys 1 & 2." (App. 68). Undercover Detective observed that the male front passenger of the black truck was wearing a multi-colored shirt and had dreads. After Unwitting Individual left the truck, it immediately left the area, and law enforcement followed it back to the Condo. There, surveillance units observed the front seat passenger, the black male with dreads, exit the truck and use a key to enter the front door of the Condo.

[7] For the fourth heroin purchase, law enforcement again conducted surveillance of the Condo and the parking lot where Undercover Detective met Unwitting Individual. After Unwitting Individual called the source, surveillance units observed a black Chevy Impala, driven by a black male wearing a gray sweatshirt, exit the garage at the Condo. Law enforcement followed the Impala

to the location where Undercover Detective and Unwitting Individual were waiting to make a purchase. After Unwitting Individual exited the Impala, surveillance followed the Impala to the Condo, where it pulled into the garage.

[8] Based upon the facts and circumstances surrounding the four heroin purchases and surveillance of the Condo performed, Detective Dings drafted a search warrant affidavit. In addition to the details of the four heroin purchases described above, the search warrant affidavit contained, in relevant part, the following:

> From this investigation, observations of law enforcement and the pattern for the controlled transactions which includes a phone call by the unwitting individual to the heroin supplier and the subsequent actions of the black male who leaves 4837 Shallow Water Place to meet with the unwitting individual, I have good cause to believe that the source who supplies the unwitting individual with the heroin sold to the undercover detective during these transactions lives at 4837 Shallow Water Place and that the heroin that is being supplied to the unwitting individual who is acting as a "middle man" dealer during this investigation is being kept at the residence of 4837 Shallow Water Place.

(App. 69).

[9] A commissioner issued Detective Dings a search warrant for the Condo. Prior to executing the warrant on February 15, 2015, Detective Dings and another detective surveilled the Condo for approximately ninety minutes. Detective Dings also distributed a photograph of Morris to all officers assisting him. At some point, the black Impala from the fourth heroin purchase exited the Condo garage. The assisting detective saw that the driver of the Impala was a black male and had "the same similar hairstyle" as Morris did in the photo. (Tr. Vol.

2 at 55). Law enforcement followed the Impala and initiated a traffic stop. Because law enforcement had previously been given a photograph of Morris, the officer who pulled the Impala over positively identified Morris as the driver. Morris was taken into custody, and the police found a set of keys on his person. One of the keys was used later by law enforcement to enter the Condo.

[10] The police then took Morris to the Condo where they executed the search warrant. They brought Morris inside and read him his *Miranda* rights, which he stated he understood. Morris proceeded to inform law enforcement that his bedroom was at the end of the hall. However, law enforcement found clothing and other property that belonged to Morris in the middle bedroom. Inside the middle bedroom, law enforcement found a pair of tennis shoes matching Morris' size. Inside the right tennis shoe, police found a letter addressed to Morris, as well as an oxycodone pill and a bag containing heroin. Inside the left tennis shoe, police found a second bag of heroin. On a shelf near the tennis shoes, law enforcement found a third bag containing heroin and three oxycodone pills. In total, law enforcement recovered 20.07 grams of heroin from this bedroom. They also found a shopping bag with $964 in cash and a pair of khaki pants that also contained approximately $12,000 in cash in the middle bedroom. Morris admitted that the letter and oxycodone pills belonged to him, but he denied ownership of the heroin and money. Inside the kitchen, law enforcement found several bags of heroin. They also recovered Dormin, a sleep aid commonly used as a cutting agent; a Magic Bullet blender, which is

commonly used to mix heroin and cutting agents; a press, which is commonly used to compact the heroin mixture into a brick; and several scales.

[11] The State charged Morris with Count 1, Level 2 felony dealing in a narcotic drug (heroin); Count 2, Level 3 felony possession of a narcotic drug weighing at least twenty-eight grams (heroin); and Count 3, Level 6 felony possession of a narcotic drug (oxycodone). The State also alleged that Morris was an habitual offender.

[12] On June 1, 2015, Morris filed a motion for a *Franks*[1] hearing, claiming that Detective Dings' characterization of the four heroin purchases as "controlled" transactions in the search warrant affidavit was materially false and misleading. (App. 69). That same day, Morris also filed a motion to suppress, claiming that the traffic stop was unlawful and that the evidence obtained as a result of the stop would be inadmissible. Morris specifically argued that the "key [obtained] from the Defendant[,] which was later used to enter the premises[,]" should be excluded. (App. 52). On June 30, 2015, the trial court held a hearing on the motion for a *Franks* hearing. The trial court also considered the lawfulness of

---

[1] In *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), the United States Supreme Court held that "where the defendant makes a substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [was] necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held." A hearing at which the defendant is allowed to attack the validity of a search warrant in such a manner is referred to as a "*Franks* hearing." *See Haynes v. State*, 411 N.E.2d 659, 661 (Ind. Ct. App. 1980).

the traffic stop. After the hearing on both motions, the trial court denied the *Franks* motion and the motion to suppress.

[13] On March 17, 2016, this matter proceeded to jury trial. The State presented testimony from Detective Dings and three other law enforcement officers involved with the execution of the search warrant.[2] In addition to the facts above, Detective Dings discussed the additional surveillance he conducted on the Condo. He stated that he observed a black male, later identified as Morris, at the Condo "on multiple occasions." (Tr. Vol. 2 at 221). Detective Dings estimated that he observed Morris on "[m]ore than 10[]" occasions and that he drove "[a] newer model Ford Escape, and a black, newer model, Chevy Impala." (Tr. Vol. 2 at 222).

[14] Before closing arguments, the trial court instructed the jury on two lesser-included offenses: (1) Level 4 felony possession of a narcotic drug weighing between ten and twenty-eight grams as a lesser-included offense to the Level 3 felony possession of narcotic drug charge; and (2) Level 6 felony maintaining a common nuisance as a lesser-included offense to the Level 2 felony dealing in a narcotic drug. The jury found Morris guilty on the two lesser-included charges of Level 4 felony possession of a narcotic drug and Level 6 felony maintaining a common nuisance, as well as on the original charge of Level 6 felony possession of a narcotic drug. The jury did not reach a unanimous verdict on

---

[2] Undercover Detective and Unwitting Individual did not testify.

Count 1, Level 2 felony dealing in a narcotic drug and returned a verdict of not guilty on Count 2, Level 3 felony possession of a narcotic drug weighing at least twenty-eight grams.

[15] After the verdicts were read, the State indicated a hesitation with accepting the jury's verdict because it was unsure if it would be able to re-try the Level 2 dealing charge due to the Level 4 felony possession conviction and the evidentiary issue that "dealing kind of includes possession. Like he had to possess it to deal it." (Tr. Vol. 3 at 141). The State raised the prospect of asking for a mistrial on all counts, but the trial court indicated an unwillingness to grant such a request. The parties discussed the matter further, and before the jury reconvened for the habitual phase of the trial, the State explained that it did not want to attach the habitual offender allegation to the Level 4 felony conviction and that it wanted to dismiss the habitual offender enhancement. The State also requested that the Level 2 felony dealing charge and the habitual offender allegation be stayed for retrial. In direct response, defense counsel stated: "And we would agree that he be released and then we would have further time to either negotiate or come back." (Tr. Vol. 3 at 146). Thereafter, the parties discussed the best procedural process going forward and the following colloquy ensued:

> [Defense Counsel]: All right. So we waive the habitual, come back.
>
> The Court: I think you –
>
> [Defense Counsel]: I mean, waive the jury trial for the habitual, come back for –

[The State]: Or I can dismiss the habitual.

The Court: I think that's the wise thing to do.

[The State]: And then file it prior to – because then it would only be able to attach to the level two felony.

[Defense Counsel]: And that's the issue that pops out?

[The State]: Yes.

[Defense Counsel]: Okay.

The Court: Yeah. I think that's the smarter thing to do.

[The State]: Do I need to –

[Defense Counsel]: Well, then that –

[The State]: Can I just orally move to –

[Defense Counsel]: - that cleans it up.

(Tr. Vol. 3 at 149).

[16] Thereafter, the trial court found a hung jury on Count 1 and entered judgments of conviction on the counts for which the jury returned guilty verdicts. The State then orally moved to dismiss the habitual offender allegation. The State also filed a written motion to dismiss the habitual offender allegation with the notation that it was "to be re-filed." (App. 155). Morris waived his right to be sentenced within 30 days of the date of conviction and was released on bond.

[17] At a subsequent pre-trial conference, the State informed the trial court that it would not seek a retrial on Count 1, the Level 2 dealing charge. The State then moved to amend the existing charging information to refile the habitual offender enhancement. In its motion, the State explained that it had

"determined that it cannot go forward with a retrial on Count I, Dealing in a Narcotic Drug, Level 2 felony, as the Court denied the State's motion for a mistrial as to all counts on March 18, 2016, and entered judgment of conviction as to Count III, which is factually a lesser-included offense of Count I." (App. 157). Morris objected to the motion to amend.

[18] The trial court held a hearing on the State's motion to amend. Relying on INDIANA CODE § 35-50-2-8(h), Morris argued that if the court were to grant the State's motion, the same jury that found Morris guilty of the three counts would have to reconvene to determine whether he was an habitual offender. The trial court rejected Morris' statutory argument and found that there was no authority that prohibited a second jury from deciding the habitual phase of the trial. The trial court granted the State's motion to amend and found that Morris' substantial rights were not prejudiced by permitting the State to refile the habitual offender enhancement. The trial court explained:

> The habitual was filed I think sometime in February or March of 2015 . . . when the original charges were filed, and its been pending ever since. [E]ven at the time of the jury, at the conclusion of the jury trial it was noted on the record that even though the State was choosing to dismiss the habitual, that was going to be refiled. So, I think there was knowledge all along that, the habitual offender count was going to be pursued by the State, so I definite[ly] think the motion to amend, and the granting of such by the court is fairly clear cut.

(Tr. Vol. 2 at 77-78).

Thereafter, Morris waived his right to a jury trial on the habitual phase. The trial court then heard evidence on the habitual offender allegation and found that Morris was an habitual offender.

At the sentencing hearing, the trial court imposed an eight (8) year sentence for the Level 4 felony conviction and enhanced the sentence by eight (8) years for the habitual offender enhancement. The trial court also imposed executed terms of one (1) year for each of the two Level 6 felony convictions, to be served concurrently with the Level 4 felony. Thus, the trial court imposed an aggregate executed sentence of sixteen (16) years. Morris now appeals.

# Decision

On appeal, Morris argues that: (1) the trial court abused its discretion by admitting certain evidence; and (2) the trial court erred by permitting the State to amend the charging information. We address each of his contentions in turn.

## 1. Admission of Evidence

Morris first contends that the statements made and the drugs and money that the State seized from the Condo are inadmissible because the search warrant affidavit lacked probable cause. Next, Morris argues that the key obtained from his person is inadmissible because the investigative stop lacked reasonable suspicion. He frames this issue as whether the court erred by denying his motion to suppress. Because Morris is appealing following a conviction, we

note that Morris' challenge would more appropriately be framed as whether the trial court properly admitted the evidence at trial. *See Fry v. State*, 25 N.E.3d 237, 243 (Ind. Ct. App. 2015), *trans. denied*. A trial court has broad discretion in ruling on the admissibility of evidence and we will disturb its rulings only where it is shown that the court abused that discretion. *Halliburton v. State*, 1 N.E.3d 670, 675 (Ind. 2013). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id*.

### A. Search Warrant

[23] Morris first argues that the search warrant affidavit lacked probable cause because it "falsely states that police conducted a series of 'controlled transactions[]'" and that the evidence obtained from the Condo should have be suppressed. (Morris' Br. 13).

[24] The Fourth Amendment of the United States Constitution provides that citizens have the right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. When officers secure a warrant ordering them to search a particular place, their actions are presumptively lawful, and "the burden is upon the defendant to overturn that presumption." *Jones v. State*, 783 N.E.2d 1132, 1136 (Ind. 2003). When a defendant establishes "that the affidavits used to obtain the warrant contain perjury by the affiant, or a reckless disregard for the truth by him, and the rest of the affidavit does not contain materials sufficient to constitute

probable cause[,]" the warrant may be invalidated. *Id*. (citing *Franks*, 438 U.S. at 154). "[M]istakes and inaccuracies of fact stated in a search or arrest warrant affidavit will not vitiate the reliability of the affidavits so long as such mistakes were innocently made." *Utley v. State*, 589 N.E.2d 232, 236-37 (Ind. 1992).

[25]    As a reviewing court, our duty "is simply to ensure that [there was] a substantial" basis for finding probable cause. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "Substantial basis requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination[]" of probable cause. *Houser v. State*, 678 N.E.2d 95, 99 (Ind. 1997). We owe "great deference" to the initial probable cause determination and will not invalidate warrants by interpreting probable cause affidavits "in a hypertechnical, rather than a commonsense, manner." *Gates*, 462 U.S. at 236. Even if the defendant can make these showings, a reviewing court will not automatically overturn the warrant, but will excise the offending provisions from the warrant application. *Utley*, 589 N.E.2d at 236.

[26]    "A court may issue warrants only upon probable cause, supported by oath or affirmation[.]" IND. CODE § 35-33-5-1. INDIANA CODE § 35-33-5-2 specifies the minimum information necessary to establish probable cause and provides in relevant part:

> (a) Except as provided in section 8 of this chapter, and subject to the requirements of section 11 of this chapter, if applicable, no warrant for search or arrest shall be issued until there is filed with the judge an affidavit:

(1) particularly describing:

    (A) the house or place to be searched and the things to be searched for; or

    (B) particularly describing the person to be arrested;

(2) alleging substantially the offense in relation thereto and that the affiant believes and has good cause to believe that:

    (A) the things sought are concealed there; or

    (B) the person to be arrested committed the offense; and

(3) setting forth the facts known to the affiant through personal knowledge or based on hearsay, constituting the probable cause.

"'An affidavit demonstrates probable cause to search premises if it provides a sufficient basis of fact to permit a reasonably prudent person to believe that a search of those premises will uncover evidence of a crime.'" *Merritt v. State*, 803 N.E.2d 257, 260 (Ind. Ct. App. 2004) (quoting *Hensley v. State*, 778 N.E.2d 484, 488 (Ind. Ct. App. 2002)).

[27] Here, the search warrant affidavit provided a substantial basis to support a probable cause determination and issuance of a warrant for the Condo. The third and fourth heroin purchases tied the vehicles in which Morris brought heroin to Unwitting Individual and Undercover Detective to the Condo. During these purchases, law enforcement conducted surveillance of the Condo, as well as the parking lot where Undercover Detective met Unwitting Individual. When Unwitting Individual made the call for the purchases, law enforcement observed Morris leave the Condo. They followed him to where Unwitting Individual and Undercover Detective were waiting. After the purchases, Morris was followed and observed using a key to enter the Condo.

The search warrant affidavit also describes additional surveillance conducted on the Condo that not only placed Morris entering and exiting the Condo on several occasions, but also tied him to the Escape and Impala.

[28] Despite this information tying the Condo to the heroin purchases, Morris contends that the affidavit's characterization of the four purchases as "controlled transactions" was a materially false statement. (App. 69). He argues that "[w]hen the false statement about controlled transactions is excised from the search warrant affidavit, what's left is Unwitting's hearsay[,]" which cannot support a finding of probable cause. (Morris' Br. 20). We disagree. As described above, what precedes the phrase is several pages of detailed descriptions of firsthand observations by law enforcement officers. "The affidavit thus provided a substantial basis for finding that the 'particular place contains evidence of a crime.'" *Watkins v. State*, 85 N.E.3d 597, 604 (Ind. 2017) (quoting *Membres v. State*, 889 N.E.2d 265, 275 (Ind. 2008) (emphasis omitted)). The warrant was based on a "'practical, commonsense decision'" that there was "'a fair probability that contraband or evidence of a crime'" would be found at the Condo. *Id.* (quoting *Query v. State*, 745 N.E.2d 769, 771 (Ind. 2001)). Even assuming Morris could prove that the phrase "controlled transactions," which appears only once in the ten-page affidavit, was an inaccurate description of what occurred, probable cause for the search still exists. We hold that there was adequate information in the affidavit to support a probable cause determination and issuance of a warrant for the Condo. Thus, the trial court did not abuse its discretion when it admitted the evidence seized from the Condo.

## B. Investigative Stop

[29] Morris next argues that the key seized from his person is inadmissible because it was obtained during an investigative stop not based on reasonable suspicion of criminal activity. Specifically, Morris argues that "all evidence that flowed from [the investigative] stop, including any incriminating statements made by Morris[,]" is inadmissible.[3] (Morris' Br. 26).

[30] It is well settled that reasonable suspicion to justify an investigative stop must be based on specific and articulable facts known to the officer at the time of the stop that leads the officer to believe that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Reasonable suspicion requires more than mere hunches or unparticularized suspicions. *Id*. at 27. An officer must be able to point to specific facts giving rise to reasonable suspicion of criminal activity. *Finger v. State*, 799 N.E.2d 528, 534 (Ind. 2003). The reasonable suspicion inquiry is highly fact-sensitive and is reviewed under a sufficiency of the evidence standard. *Id*. at 533. Like any matter of sufficiency of the evidence, "'[t]he record must disclose substantial evidence of probative value that supports the trial court's decision. We do not reweigh the evidence and we

---

[3] In his Reply Brief, Morris clarifies that the specific evidence alluded to in this statement includes: (1) the key Morris possessed to the Condo; (2) Morris' statement that one of the bedrooms belonged to him; (3) Morris' admission regarding the oxycodone pills; and (4) that he was present at the Condo on the day police executed the search warrant. Because his argument extends to the evidence obtained pursuant to a lawful search warrant, we limit our review to the key obtained from his person.

consider conflicting evidence most favorably to the trial court's ruling.'" *Id*. (quoting *Goodner v. State*, 714 N.E.2d 638, 641 (Ind. 1999) (citations omitted)).

[31] Here, the police had reasonable suspicion to believe that the driver of the Impala was the same individual who supplied Unwitting Individual with heroin. Law enforcement conducted an extensive operation with detailed surveillance. Detective Dings testified that he previously observed a person later identified as Morris driving the Impala. He also stated that he had never observed anyone other than Morris drive that vehicle from the Condo. On the date the search warrant was executed, Detective Dings distributed a picture of Morris to other law enforcement officers. They then observed the Impala exit the Condo's garage. An assisting detective saw that the driver of the Impala was a black male and had "the same similar hairstyle" as Morris did in the photo. (Tr. Vol. 2 at 55).

[32] We conclude that there was reasonable suspicion to stop Morris. Morris' argument to the contrary ignores the axiom that "an investigative stop may be based upon the collective information known to the law enforcement organization as a whole." *State v. Glass*, 769 N.E.2d 639, 643 (Ind. Ct. App. 2002), *trans. denied*. As described above, there was reasonable suspicion to believe that the driver of the Impala was the same individual who supplied Unwitting Individual with heroin. Law enforcement was only required to have a "reasonable suspicion" to stop Morris, not "absolute certainty" that Morris was involved in illegal activity. *See Rutledge v. State*, 28 N.E.3d 281, 290 (Ind.

Ct. App. 2015) (stating that "*Terry* does not require absolute certainty of illegal activity").

## 2. Habitual Offender Enhancement

[33] Finally, Morris argues that the trial court erred by permitting the State to amend the charging information to refile the habitual offender allegation after the parties agreed to procedurally postpone the habitual offender proceeding.

[34] Morris, however, has waived appellate review of his argument because his argument on appeal is not the argument he presented to the trial court. As we have long held, "[a]ny grounds for objections not raised at trial are not available on appeal, and a party may not add to or change his grounds in the reviewing court." *Hunter v. State*, 72 N.E.3d 928, 932 (Ind. Ct. App. 2017), *trans. denied*. Below, Morris relied on INDIANA CODE § 35-50-2-8(h), arguing that the habitual offender enhancement could not be refiled because it would have to be tried by the same jury that originally found Morris guilty. On appeal, Morris argues that the State's refiling of the habitual offender enhancement was contrary to the plain meaning of INDIANA CODE § 35-34-1-5(e) and that the State was not allowed to refile the habitual allegation at all regardless of what jury heard it. Because Morris failed to object to the refiling of the habitual offender enhancement under INDIANA CODE § 35-34-1-5(e), we hold that this failure below results in waiver. *See Everroad v. State*, 590 N.E.2d 567, 569 (Ind. 1992) (noting that "fundamental unfairness" may result from reviewing a claim

raised after the opportunity to make a record or conduct proper analysis in the trial court has passed).

[35] Because Morris waived his argument, he can prevail only by meeting the "daunting" fundamental error standard. *Griffith v. State*, 59 N.E.3d 947, 956 (Ind. 2016). The fundamental error exception is "extremely narrow[ ] and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Matthews v. State*, 849 N.E.2d 578, 587 (Ind. 2006). "Harm is not shown by the fact that the defendant was ultimately convicted; rather harm is found when [the] error is so prejudicial as to make a fair trial impossible." *Hoglund v. State*, 962 N.E.2d 1230, 1239 (Ind. 2012), *reh'g denied*. "Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred, not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fails to preserve an error." *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014), *reh'g denied*.

[36] Here, the trial court and the parties found themselves in a peculiar situation. Our review of the record reveals that all parties discussed and agreed to the State's dismissal of the habitual offender enhancement, with the understanding that the State wanted to use it for a retrial on the Level 2 felony dealing charge. The State eventually chose not to refile the dealing charge, and the trial court allowed the State to go forward with the habitual. Morris fails to provide any evidence demonstrating how he was prejudiced by the refiling of the habitual

offender enhancement. Indeed, the State filed the habitual offender enhancement when it originally charged Morris in 2015 and as described above, he knew that the habitual was going to be refiled and had originally agreed to that procedure. *See Haymaker v. State*, 667 N.E.2d 1113, 1114 (Ind. 1996) (holding that the purpose of INDIANA CODE § 35-34-1-5(e) is to allow a defendant sufficient time to prepare a defense for an habitual offender charge). Accordingly, Morris cannot show error, let alone fundamental error.

[37] Affirmed.

Najam, J., and Crone, J., concur.