**FILED**

Jul 31 2017, 5:45 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Brian J. Johnson
Danville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Indiana Attorney General

Jodi Kathryn Stein
Laura R. Anderson
Deputy Attorneys General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Brandon McGrath,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

July 31, 2017

Court of Appeals Case No.
49A04-1610-CR-2270

Appeal from the
Marion Superior Court.

The Honorable
Jose D. Salinas, Judge.

Trial Court Cause No.
49G14-1404-FD-21182

**Kirsch, Judge**

# Statement of the Case[1]

[1] After law enforcement officers followed up on a tip from CrimeStoppers, they requested a warrant to use thermal imaging technology to gain additional evidence to confirm whether an active indoor marijuana grow operation existed at the location designated in the tip. The warrant was granted and the results of the imaging showed higher than normal heat signatures emanating from an upstairs area of the house at that address. Officers requested a search warrant for the premises based on evidence presented in both search warrant applications.

# Issue

[2] The dispositive question here is whether the evidence presented with respect to the first search warrant application sufficiently established probable cause to support further investigation. We reverse and remand.

# Facts and Procedural History

[3] At McGrath's bench trial, the parties stipulated that in April 2014, an anonymous call to CrimeStoppers alerted IMPD of a possible active marijuana grow operation located at 5926 North Crittenden Avenue in Indianapolis. The

---

[1] We commend counsel for their willingness to present their arguments on appeal at oral argument held at Trine University, in Angola, Indiana, before this year's group of attendees at Hoosier Boys State. Counsels' capable written and oral advocacy has greatly aided this court in the disposition of the appeal. We also extend our gratitude to those at Trine University and all those, including the American Legion members, who support Hoosier Boys State, for their hospitality.

tipster identified the house by the street address, its color, and the first names of the occupants, Brandon and Kelsey. The tipster added that an odor of marijuana often emanated from the house and a bright light was visible from a window nightly.

[4] Detective Sergeant Kerry Buckner of IMPD, following up on the tip, conducted surveillance on the house during daylight hours, verifying the address and color of the house provided by the tipster. The physical marking of the address was only observable near the house, not from the street. He also noted that though the home had a central air conditioning system, there were individual air conditioning units in both upstairs windows and several of the windows had a dark covering—consistent with an indoor marijuana grow operation, a conclusion reached based on Detective Buckner's training and experience.

[5] Later that evening, Detective Buckner continued his surveillance and observed a light of an "apparent difference" emanating from an upstairs window. Ex. Vol. p. 8. Based on the officer's training and experience, he concluded that the high intensity glow of the light was consistent with the type of lights used for indoor grow operations. The officer had also confirmed through police databases, which were not accessible by the public, that the occupants of the house were a male named Brandon McGrath and a female named Kelsey Bigelow. Bigelow was listed as the owner of the house. BMV records, which were also restricted from public access, indicated that 5926 North Crittenden Avenue was the listed address on both McGrath's and Bigelow's driver's

licenses. Detective Buckner did not detect the odor of marijuana upon his evening inspection of the residence.

[6] Next, Detective Buckner applied for a search warrant to use a forward looking infrared, or FLIR, which is a thermal imaging detection system mounted to an aircraft[2] to detect the presence of a heat signature consistent with an active indoor marijuana grow operation. His application read as follows:

> I am a police officer with the Indianapolis Metropolitan Police Department (IMPD). I have been a police officer in Indianapolis/Marion County since 1991. I am a "law enforcement officer" as that term is defined in I.C. 35-31.5-2-185.
>
> I am currently the supervisor of the Violent Crimes Unit of the Indianapolis Metropolitan Police Department and have been so assigned since 2007. In connection with my official duties, I am involved in investigations relating to violations of the Indiana controlled substances laws.
>
> I have received training relating to enforcement of the Indiana controlled substances laws, including the following:
>
> 1. My initial training at the Indiana Law Enforcement Academy in 1991. I have satisfied the minimum basic training requirements established by rules adopted by the law enforcement training board under I.C. 5-2-1-9 and described in I.C. 35-37-4-5.
>
> 2. Basic Detective School, through the Marion County Sheriffs[sic] Department in 1997;
>
> 3. Hotel/Motel Interdiction/Hidden compartment training in March of 2002;

---

[2] The record is unclear whether the "aircraft" was a drone, helicopter, or plane.

4.    Highway Interdiction training through the U.S. Department of Justice Drug Enforcement Administration July 1998;

5.    Drug Enforcement Administration basic cannabis Investigations course June 1997;

6.    Undercover Narcotics Schools and Narcotics Detection Schools hosted by Indiana State Police, IDEA, FBI, and DEA

7.    Monthly operational and legal update training by the Marion County Prosecutor's Office.

8.    Yearly in-service training.

Based upon my training and experience, I am familiar with the methods employed by individuals engaged in the trafficking of controlled substances including the following:

1.    **Detective Sergeant Kerry Buckner**, swears or affirms that he believes and has good cause to believe that a controlled substance, to wit:  Marijuana, Cannabis, the possession of which is unlawful, is being unlawfully manufactured and cultivated at an indoor grow operation, located at **5926 Crittenden Ave, Indianapolis, Marion County, Indiana.**

Your affiant is seeing a search warrant to use a thermal imaging device on and at the residence located at **5926 Crittenden Ave, Indianapolis, Marion County, Indiana.**

The use of a thermal imaging device will assist your Affiant in developing more facts in this investigation of the offense under the Uniform Controlled Substances Act, in violation of Indiana Code 35-48-4-10 manufacturing or cultivation of marijuana, and to indicate the presence of artificial lighting for the cultivations[sic] of marijuana.  Based on my training, experience and participation in numerous indoor grow investigations, and based on my experience from other experienced narcotics officers, including those officers that trained in the use of thermal image technology, with whom I'm associated, your Affiant knows that:

A) With respect to indoor marijuana cultivation and propagation operations, suspects routinely utilize the following items and

methods, among others, in their attempts to avoid detection from the law enforcement authorities:

1.) Blackened out or covered windows, doors and other visibly detectable areas to avoid outsiders from identifying any portion of the grow operation.

2.) Guard dogs are used to protect their growing operations from theft and to alert them to subjects, including law enforcement, who are on or are approaching their property.

3.) Fixed, movable, or other type of venting systems, usually located upon high areas of buildings to vent heat, fumes and odors escaping the cultivation structure.

4.) Fictitious names and/or social security numbers on utility records.

5.) Theft of electrical power by alteration of electrical systems on the property by bypassing the utility meter so that excess usage caused by indoor grow lighting equipment does not register with the utility company.

6.) Use of portable top large scale combustible fuel generators to develop power for indoor lighting equipment to avoid registering high bills with the local utility company.

7.) The use of deodorizers and masking agent systems to mask the odor of growing marijuana that is emitted from the venting system.

8.) Remote locations and outbuildings which are detached from the main residence to prevent discovery and aid in concealment. This can also include room built underground to house the growing operation.

9.) The use of high intensity grow lights that produce large amounts of heat in enclosed areas and use large amounts of electricity.

B.) That marijuana Cultivation is a complex enterprise that:

1.) Takes at least 7-10 days to plant from clone to vegetative stage, can take 3-8 weeks to take plant from vegetative to

flowering stage, and takes at least 3-6 weeks to take the plant from flowering stage to harvest.

2.) Takes approximately 3 gallons of potting soil per plant and that the soil is used only once and then discarded.

3.) If hydroponically grown, no soil is required. This method would require the roots to be suspended in medium to large quantities of water and water soluble fertilizer.

4.) Requires a high heat, high humidity or tropical type environment to thrive.

5.) Uses a high intensity halide or high pressure sodium lights that require large amounts of power and emit a very bright white light and high amount of heat. The heat from these halide lights often causes visible differences in the moisture collection on the roof of the structure in which the grow operation is located.

6.) Causes some of the heat from the environment to dissipate into other objects and the structure in which the growing operation is being conducted. As a result of this, the temperature on the outside of the walls of the portions of the property containing the grow operation are substantially higher that [sic] the outside of the walls of the portion of the structure used for normal living or storage space.

7.) Needs to be vented to allow some heat to escape and fresh air to enter. This vent or the high heat dissipating through the structure can be detected using thermal imaging. Thermal imaging is a technique of using non-contact, non-intrusive, non-destructive scanning equipment that detects invisible infrared radiated heat at surface levels and converts this energy into visible light.

8.) Are commonly divided into two or more rooms for different stages of growing operation, i.e. growing rooms, drying rooms, supply rooms.

9.) The odor associated with growing marijuana has been compared to an odor which is a "skunk" or a "pungent sweet musty" like smell.

The information that is set forth below in this Search Warrant Affidavit is either information known personally to me, information that I obtained from other law enforcement sources, information obtained from public records, or information from a source otherwise identified in this Search Warrant Affidavit.

**THE INVESTIGATION**

During the month of April 2014, this affiant received information from an anonymous source concerning the house and occupants located at 5926 Crittenden Ave. A residence that is particularly described as a multiple story, single family dwelling that has a yellow siding type covering. The house has brown gutters and trim with a gray roof. There are no numbers visible near the front door which is a dark color. The house is situated between addresses 5920 and 5930 and is located on Marion County parcel number 8014228.

The information indicated that there was possibly a marijuana grow [operation] inside of the residence. The tipster described the residence as being yellow. They stated that there was a male and female occupant of the residence. The male was only identified as "Brandon" and the female was identified as "Kelsey". The anonymous person indicated that on a nightly basis the odor of marijuana can be smelled from outside of the house, and that bright light can be seen from outside the residence.

On April 14, 2014 this affiant initiated an independent investigation on 5926 Crittenden Ave. I conducted day time surveillance on the residence and noted that the house is yellow. I also observed that several of the house windows had dark covering on them which is consistent with person(s) that operate indoor grow operations.

The residence has a central air conditioning system, but the windows of the upstairs portion have independent air conditioning units. When individuals operate indoor grow operations, they must keep the plants' growing temperature between 70 and 80 degrees Fahrenheit. Artificial lighting is used

during the indoor grow process. The lights that are normally used are High Pressure Sodium or Metal Halide lights. These lights produce high temperatures that have the possibility of burning the marijuana before it could grow. Growers typically use air conditioning units or high speed fans to balance the temperature in the grow room.

Later in the evening on April 14, 2014 this affiant conducted surveillance on 5926 Crittenden Ave. During my surveillance I noted that the north, upstairs window had a light emitting through the window covering. When I visually compared the light emitting from the north upstairs window with the lighting emitting from the west upstairs window, there was an apparent difference. Through my experience and training I recognized the high intensity glow coming from the north upstairs window as being consistent with light that emits from High Pressure Sodium light and Metal Halide lights.

This affiant learned through research using police data bases that the occupants of the house are Brandon McGrath and Kelsey Bigelow. I also learned that Kelsey Bigelow is listed as the owner of the house and property located at 5926 N Crittenden.

Upon checking the Indiana Bureau of Motor Vehicle records, this affiant found that the address listed on Brandon McGrath and Kelsey Bigelows [sic] Indiana drivers' license is 5926 N Crittenden Ave.

**REQUEST FOR SEARCH WARRANT**

Based off the above stated facts and attending circumstances this affiant believes and has good cause to believe that Brandon McGrath and Kelsey Bigelow are cultivating marijuana. This affiant believes that they are using their residence located at 5926 N Crittenden Avenue Indianapolis, Indiana (Pictures as attachment A) to grow marijuana. This affiant requests that a search warrant be issued to utilize an aircraft mounted thermal imaging detection system to view the residences and outbuildings on or about the curtilage of the

property to detect the presence of a heat signature commensurate with an indoor marijuana growing operation.

Appellant's App. pp. 13-17.

[7] After the first warrant application was granted, the search was executed by Detectives Michael Condon and Sergeant Edwin Andersen, whose experience and training are not apparent from the record, but upon whose experience Detective Buckner relied. Nevertheless, Detective Condon informed Detective Buckner that he observed from the upstairs of the address a heat signature that he recognized through his training and experience as being consistent with the heat signature put off by an active indoor marijuana grow operation.

[8] Based on this additional information, Detective Buckner applied for a second search warrant for the residence and property. After the warrant was granted, the search revealed an elaborate, active, marijuana grow operation of 67.5 pounds of marijuana plants (180 individual plants) and over five pounds of marijuana leaves. Officers also discovered plant fertilizer, heat lamps, dehydrators, deodorizing machines, and drying racks. McGrath, who had been Mirandized, told officers that he was unemployed and "that's why he worked inside the house." Tr. p. 64.

[9] The State charged McGrath with one count of dealing in marijuana[3] as a Class D felony and one count of possession of marijuana[4] as a Class D felony. McGrath requested a *Franks*[5] hearing and filed a motion to suppress, challenging the search warrants under both state and federal constitutions, claiming a lack of probable cause. A hearing was held during which McGrath's *Franks* hearing arguments were incorporated but not specifically ruled upon. The trial court denied the motion to suppress, and McGrath subsequently filed a motion to correct error, which was apparently denied during a pre-trial conference on October 23, 2015. After the conclusion of his bench trial, during which the seized evidence was admitted over objection, McGrath was found guilty as charged and sentencing was stayed pending this appeal.

## Discussion and Decision

[10] When an appellant has lodged an unsuccessful motion to suppress evidence and then proceeds to trial, the issue for appellate review is whether the trial court abused its discretion by admitting the evidence against the logic and effect of

---

[3] Ind. Code § 35-48-4-10 (2013).

[4] Ind. Code § 35-48-4-11 (2013).

[5] *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), provided that if, after a hearing, a defendant establishes by a preponderance of the evidence that the false statement was included in the affidavit sworn to by a law enforcement officer, knowingly and intentionally, or with reckless disregard for the truth, and the false statement was necessary to the magistrate's finding of probable cause to issue the warrant, the warrant is void and the fruits of the search are excluded as evidence at trial.

the facts and the circumstances affecting a party's substantial rights. *Clark v. State*, 994 N.E.2d 252, 259 (Ind. 2013).

[11] We begin our discussion by acknowledging the extreme care used by the law enforcement officers in this case in their attempts to adhere to proper procedures in conducting this investigation. The law related to the use of thermal imaging, like the technology it represents, is dynamic and developing. For example, in this jurisdiction, in a case of first impression, the Seventh Circuit of the United States Court of Appeals held that thermal imaging scanning was not a search within the meaning of the Fourth Amendment, joining the Eighth and Eleventh Circuits in doing so. *U.S. v. Myers*, 46 F.3d 668, 668 (7th Cir. 1995). The thermal imaging scanner in that case did not penetrate the viewed object. The Court's analysis focused on whether Myers had a subjective expectation of privacy in the heat emitted from his home and whether society recognized that expectation as reasonable.

[12] The holding in that case, however, later was abrogated by the United States Supreme Court opinion in *Kyllo v. U.S.*, 533 U.S. 27, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001). In this appeal from the Ninth Circuit, an agent used a thermal imager to detect heat emissions from a home, without first seeking a warrant. An evidentiary hearing established that the thermal imager was a non-intrusive device, emitting no beams or rays, and showed a crude visual image of the heat being radiated as was detectable from outside the house. The device could not penetrate walls or windows to reveal human conversations or activities, nor were intimate details of the home observed. Following the

hearing, a search warrant was issued for the house based, in part, on the scanning evidence.

[13] The U.S. Supreme Court reversed the denial of the motion to suppress the evidence seized after the scanning had occurred stating, "Where, as here, the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." 533 U.S. at 40. The matter was remanded to the district court to determine if the search warrant for the house was supported by probable cause minus the evidence provided by the thermal imaging scanner. *Id.*

[14] Here, Detective Buckner correctly recognized that the use of the thermal imaging scanner was a search and applied for a warrant to conduct that search. "Generally, to be reasonable, a search must be conducted pursuant to a properly-issued warrant supported by probable cause." *Pinner v. State*, 74 N.E.3d 226, 229 (Ind. 2017). Many of the reported cases across the country discussing the use of thermal imaging scanners, or FLIR, are appeals from the use of that technology without first obtaining a search warrant for the use of the technology. Those appeals come from decisions on motions to suppress or the admission of evidence at trial, of evidence seized by way of the warrant to search the residence, using the warrantless imaging information to establish probable cause for that subsequent search.

[15] Nonetheless, a warrant for the use of thermal imaging scanners is necessary and must be supported by probable cause. "'The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a *fair probability* that contraband or evidence of a crime will be found in a particular place.'" *Hayworth v. State*, 904 N.E.2d 684, 694 (Ind. Ct. App. 2009) (citing *State v. Spillers*, 847 N.E.2d 949, 952-53 (Ind. 2006), quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)) (emphasis added). Regarding the levels of review, "The duty of the reviewing court is to determine whether the magistrate had a '*substantial basis*' for concluding that probable cause existed." *McCollum v. State*, 63 N.E.3d 5, 9 (Ind. Ct. App. 2016) (quoting *Illinois v. Gates*, 462 U.S. at 238-39, 103 S. Ct. 2317) (emphasis added). "'[S]ubstantial basis requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination' of probable cause." *Jaggers v. State*, 687 N.E.2d 180, 181-82 (Ind. 1997) (quoting *Houser v. State*, 678 N.E.2d 95, 99 (Ind. 1997)).

[16] The definition of a reviewing court includes the trial court ruling on the motion to suppress and an appellate court reviewing that decision. *Jaggers*, 687 N.E.2d at 182. On appellate review, we consider only the evidence presented to the issuing magistrate and not post hac justifications for the search. *Id*. "We review the trial court's substantial basis determination de novo." *McCollum*, 63 N.E.3d at 9 (citing *Jaggers*, 687 N.E.2d at 182).

[17] In *Johnson v. State*, 992 N.E.2d 955, 957 (Ind. Ct. App. 2013), *trans. denied*, (internal citation omitted), in a case involving a traffic stop, not the issuance of a search warrant, a panel of this court acknowledged both the substantial deference given to courts that rule on motions to suppress and our de novo review as follows:

> Although a trial court's determination of historical facts is entitled to deferential review, we employ a de novo standard when reviewing the trial court's ultimate determinations of reasonable suspicion and probable cause. In other words, when a trial court has admitted evidence alleged to have been discovered as the result of an illegal search or seizure, we generally will assume the trial court accepted the evidence presented by the State and will not reweigh that evidence, but we owe no deference as to whether that evidence established the constitutionality of a search or seizure.

[18] "Probable cause has long been described as a fluid concept incapable of precise definition. It is to be decided based on the facts of each case." *McCollum*, 63 N.E.3d at 9 (quoting *Figert v. State*, 686 N.E.2d 827, 830 (Ind. 1997)). "The level of proof necessary to establish probable cause is less than that necessary to establish guilt beyond a reasonable doubt." *Id.* (quoting *Jellison v. State*, 66 N.E.2d 532, 534 (Ind. Ct. App. 1995)). "Probable cause means a probability of criminal activity, not a prima facie showing." *Id.* (quoting *Fry v. State*, 25 N.E.3d 237, 245 (Ind. Ct. App. 2015), *trans. denied*).

[19] McGrath argues with respect to the first warrant that there was insufficient evidence to corroborate the anonymous tip that there was ongoing criminal

activity at his house such that search warrants were supported by probable cause. We agree.[6]

[20] Indiana Code section 35-33-5-2(b) (2005) provides in pertinent part that when the supporting affidavit is based on hearsay, the affidavit must contain reliable information establishing the credibility of the source and establishing that there is a factual basis for the information furnished, or contain information that establishes that the totality of the circumstances corroborates the hearsay. However, "uncorroborated hearsay from a source whose credibility is itself unknown, standing alone, cannot support a finding of probable cause to issue a search warrant." *Jaggers v. State*, 687 N.E.2d 180, 182 (Ind. 1997) (citing *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)). According to *Gates*, as relevant to this appeal, the reliability of hearsay, for purposes of probable cause, may be established by independent police investigation corroborating the informant's statements. *Id.* Additionally, "probable cause means a *probability* of criminal activity, not a prima facie showing." *Seltzer v. State*, 489 N.E.2d 939, 941 (Ind. 1986) (citing *Brinegar v. U.S.*, 338 U.S. 160, 69 S. Ct. 1302, 93 L. Ed. 2d 1879 (1949)).

---

[6] We acknowledge the perspective in Judge Bradford's dissent but part ways in our analysis. The dissent would not reach the question of probable cause before analyzing the good faith efforts of law enforcement in assessing the admissibility of the evidence ultimately seized from the residence. The majority sees this differently, reviewing probable cause for the issuance of the first warrant, while recognizing the considerable and diligent efforts made by law enforcement in this investigation of the anonymous informant's tip to them. The evidence presented to the magistrate and the trial court, while sufficiently setting forth what corroborating information was gathered, insufficiently established probable cause of criminal activity to warrant further searches, beginning with the FLIR search.

[21] Here, Detective Buckner conducted an independent investigation, verifying all details provided by the tipster save for the smell of marijuana emanating from the premises. McGrath, on the other hand, presented photographic evidence that in the area in which he lives, it is not uncommon for houses to have both central air conditioning and independent air conditioning units, due to the age of the houses. McGrath further argued that it was not uncommon for people to have coverings over their windows—drapes, blinds, or blankets—in lower income areas, which he characterizes his as being, in college dorms, or when residents are out of town. McGrath additionally argued that it is not unreasonable for someone to use two diverse styles of light bulbs differing in light strength, noting that many varieties can be purchased in home improvement stores.

[22] McGrath challenges the adequacy of the police investigation supporting the search of his house relying on *Jaggers*. In *Jaggers*, the anonymous tipster provided law enforcement with information that: (1) he had personally seen marijuana in and around Jaggers' house on numerous occasions over the course of several years, and most recently in the prior week; and, (2) Jaggers was growing marijuana on two plots of land away from his residence. The caller also provided a description of the house and the location of the offsite plots, including approximately how many marijuana plants would be found there. Following up on the tip, law enforcement officers verified the accuracy of the caller's description of the house and ascertained that a truck in the driveway of the house was registered to Jaggers. The officer drove to each of the off-site

plots and found marijuana growing there, with each plot easily accessible to the public. After the search warrant for the house was granted, a substantial quantity of marijuana and related paraphernalia was discovered.

[23] Jaggers was convicted in a bench trial and he appealed, presenting claims only under the Fourth Amendment and Indiana Code section 35-33-5-2. On transfer, the Supreme Court held that under Fourth Amendment analysis, "the only factor cutting toward crediting the tip in this case was that the caller claimed to have personally witnessed the criminal activity." 687 N.E.2d at 183. The caller, however, gave no information that would allow a neutral magistrate to assess the credibility of the claimed observation. "The caller's assertion of personal knowledge carries little weight in light of the total lack of corroboration of the claim and no basis for concluding that the caller was a credible source." *Id.* The Court concluded by stating, "[I]f any anonymous caller's allegation, uncorroborated by anything beyond public knowledge, could justify a search, every citizen's home would be fair game for a variety of innocent and not so innocent intrusions." *Id.* The same observation was made under state statutory analysis, concluding that there must be something beyond information in the public domain offered to support the credibility of the anonymous source. *Id.* at 184.

[24] In addition to the discussion in *Jaggers*, we find persuasive the rationale expressed in a decision from California in which a police officer sought a search warrant for the use of a thermal imaging scanner to corroborate a tip received from an anonymous informant. In *People v. Gotfried*, 131 Cal. Rptr. 2d 840 (Cal.

Ct. App. 2003), the issuance of a search warrant for the use of thermal imaging and whether there was sufficient evidence of probable cause to support the warrant was considered as a matter of first impression. The application for the warrant in *Gotfried* set forth the following:

> Affiant is a Deputy Sheriff for the Monterey County Sheriff's Office and has been so employed since 1982. Since December, 1993, affiant has been assigned full-time to the County of Monterey Marijuana Eradication Team which specifically targets the detections, arrest and prosecution of marijuana growers.
>
> Affiant has received formal training in the investigation of narcotics violations, including special classes from the Department of Justice, and Drug Enforcement Administration. Affiant has also had extensive in-service training from the Sheriff's Office and veteran deputy sheriffs who have specialized in narcotics law enforcement for many years. Affiant has participated in the investigation, surveillance, arrest, and search for contraband in numerous cases involving marijuana, cocaine, and heroin. Affiant has assisted the Monterey County Sheriff's Office Special Enforcement Detail in the eradication of several marijuana gardens and was a primary investigator in the detection, arrest, and prosecution of a case involving a major indoor marijuana garden of 492 plants.
>
> Affiant has also read various written materials concerning narcotic law violations, especially relating to the cultivation and sales of marijuana. Affiant has further spoken with experts in the field as well as drug users concerning the methods of operation of marijuana growers and sellers and sellers of other illicit drugs.
>
> Based on training and experience, affiant is thoroughly familiar with the manner in which marijuana is grown, harvested, packaged, sold and used. Through training and experience, affiant is familiar with the appearance and odor of marijuana in both its live and dried forms.

Your affiant has had formal training in cannabis aerial observation from the Department of Drug Enforcement Administration and has observed 65 cannabis gardens resulting in the seizure of 11,120 cannabis plants.

Your affiant has had formal training in Thermal Imagery from the Department of Drug Enforcement Administration, and has been the investigating officer in 8 investigations of indoor marijuana cultivation cases involving the use of the Thermal Imager. Your affiant has testified as an expert in the use of the Thermal Imager in the detection of indoor marijuana cultivation.

On 9-23-98 your affiant received the following information from an anonymous informant. He/She stated that Frederic [*sic*] Gotfried was growing marijuana at his place of residence, that being 70450 Chadwick, space # 21, Jolon Road, Lockwood in the County of Monterey.

He/She told affiant Frederic [*sic*] Gotfried has been growing marijuana for 3 to 4 years in a room approximately 12 feet by 12 feet which is located to the rear of his trailer. Frederic [*sic*] Gotfried is growing 80 to 120 marijuana plants under four high pressure lights.

He/She told affiant Frederic [*sic*] Gotfried moved to the remote area of Monterey County to keep from being detected by aerial overflights with infrared cameras. He/She stated Frederic [*sic*] Gotfried diverted the electricity prior to the meter, in order to keep the high usage of electricity from being detected. He/She told affiant Frederic [*sic*] Gotfried has been diverting electricity for over 3 years.

He/She told affiant Frederic [*sic*] Gotfried sells his marijuana for $2,800 a pound to his clients in Santa Cruz.

He/She told affiant Frederic [*sic*] Gotfried has been evicted from the trailer park, and will be moving the marijuana cultivation operation to another location. He/She stated Frederic [*sic*] Gotfried drives a Volvo with the California license number

399VNR, and a Ford Bronco with the California license number 3LQG447.

9-23-98, 2200 hrs your affiant and Investigator Doug Dahmen drove to vicinity of 70450 Chadwick, Jolon Road, Lockwood at which time we were followed by a Ford Bronco with the California license number 3LQG447 which drove to space # 21 and parked. While Investigator Doug Dahmen and affiant driving [*sic*] through the trailer park, the driver of the Bronco confronted affiant and Investigator Doug Dahmen in front of space # 21, and questioned us as to our business at the trailer park. We explained we were [looking] for a friend, he told us the subject we were looking for was no longer at the trailer park and should leave due to the fact we were bothering the neighbors. The driver matched the description given by the informant and that in the DMV records.

Prior to departing the area Investigator Doug Dahmen saw a Volvo with the California license plate number 399VNR parked next to the trailer at space # 21.

Your Affiant checked the criminal history for Frederic [*sic*] Gotfried through the Monterey County Sheriff's Department's record section and found no prior criminal convictions.

A driver's license check of Frederic [*sic*] Gotfried through the Department of Motor Vehicles showed his address as being 2636 17th Avenue # 159 Santa Cruz, with the above two vehicles registered to him at that address.

Your affiant knows from training and experience that people who grow marijuana indoors, grow it in rotating cycles. Your affiant believes that marijuana is still being grown, and or drying.

Your affiant knows from my training and experience that growing marijuana indoors requires the use of artificial lighting, and that the majority of indoor marijuana cultivators utilize 400 to 1,000 watt metal halide and/or high pressure sodium lighting systems which produce a significant amount of heat. This heat is then vented from thermal gaps in the structure or it heats up the surface of the entire structure. Most indoor marijuana cultivators

utilize heat venting systems to ventilate the heat away from the grow room area. Heat ventilation systems are used to exhaust excessive heat, which is damaging to growing marijuana plants.

Your affiant knows from training and experience that thermal imaging devices can detect temperature differences indicative of indoor marijuana cultivation in each of the above described instances.

Declarant requests judicial authorization, as outlined in *People v. Deutsch* (1996) 44 Cal. App. 4th 1224, 52 Cal. Rptr. 2d 366, for the use of a thermal detection device to detect the differences in the temperature of the heat emanating from the structures on the above described property.

The thermal imaging device to be used is a passive, non-intrusive system which detects differences in temperature of an object being observed. This system does not send any beams or rays into an area, nor does it enter any structure. The system only detects differences in the surface temperatures of an object. The use of this device for detecting indoor marijuana cultivation is most effective in the early morning or late evening hours when the surface temperature is minimally affected by solar heat loading, and man-made heat sources will be highlighted by a contrasting color with cooler surfaces.

It is therefore requested that the use of the thermal imaging device be authorized between the hours of 10:00 PM. to 7:00 AM[.]

Similar thermal imaging devices have been used by public agencies and private industry for other applications such as locating missing persons in a forest, identifying heat inefficient building insulation, detecting overloaded power lines, detecting forest fire lines through smoke, and detecting hot spots in wild fires.

Declarant does not request any entry be made into the structures or property described above. Nothing will be seized from the property. I request only that law enforcement be authorized to utilize thermal imaging from outside the curtilage of the property

to observe the surface temperature of the structures on the property.

It is declarant's belief, based on the above facts, and your declarant's training and experience, that the use of the thermal imager at 70450 Chadwick, Jolon Road, Lockwood in the County of Monterey, will assist in the investigation of the violation of Section 11358 of the Health and Safety Code, Cultivation of Marijuana.

131 Cal. Rptr. 2d at 841-43.

Reversing, the court quoted *People v. Johnson*, 220 Cal. App. 3d 742, 749 (1990), discussing what level of corroboration was sufficient for reliance on information provided by an untested, anonymous, or unreliable informant. The court stated as follows:

> Because unverified information from an untested or unreliable informant is ordinarily unreliable, it does not establish probable cause unless it is "corroborated in essential respects by other facts, sources or circumstances." For corroboration to be adequate, it must pertain to the alleged criminal activity; accuracy of information regarding the suspect generally is insufficient. Courts take a dim view of the significance of "pedestrian facts" such as a suspect's physical description, his residence and his vehicles. However, the corroboration is sufficient if police investigation has uncovered probative indications of criminal activity along the lines suggested by the informant. Even observations of seemingly innocent activity provide sufficient corroboration if the anonymous tip casts the activity in a suspicious light. "It is only where . . . neither the veracity nor basis of knowledge of the informant is directly established, the information is not so detailed as to be self-verifying and there is no logistical or other reason verification from other sources cannot be achieved, that the failure to corroborate may be indicative that it was objectively

> unreasonable for the officer to believe in the existence of probable cause."

*Gotfried*, 131 Cal. Rptr. 2d at 845-46 (quoting, *Johnson*, 220 Cal. Rptr. 3d at 749).

[26] Indiana follows the same rationale in holding that "Although the anonymous tip in this case provided the police with some information that was not readily knowable by a member of the general public—i.e., the suspended driver's license—it lacked any information that would allow the police to corroborate the caller's claim that illegal activity was afoot." *Richardson v. State*, 848 N.E.2d 1097, 1103 (Ind. Ct. App. 2006) (citing *Sellmer v. State*, 842 N.E.2d 358 (Ind. 2006), citing *Florida v. J.L.,* 529 U.S. 266, 272, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000) (observing that reasonable suspicion "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.")).

[27] We recognize Detective Buckner's extensive training and experience in the investigation of illegal drug operations and the magistrate's understandable deference to that expertise. Such was also the case of the law enforcement agents in *People v. Gotfried*. However impeccable the training and experience of law enforcement officers in such matters, that training and experience cannot provide a portion of the basis for, or the missing piece needed to establish, probable cause for the issuance of the warrant authorizing the use of a thermal imaging device.

[28]   In the present case, Detective Buckner did not corroborate information from the anonymous tipster about criminal activity. The display of lightbulbs differing in intensity or brightness is not criminal activity, nor is covering one's windows. Further, the use of additional air conditioning units is not criminal activity. What was lacking was corroboration of the distinctive smell of marijuana emanating from the house, which would have provided corroboration of the tip that criminal activity likely was occurring at that location. In short, a detective's determination that there is a probability that evidence of criminal activity will be found at a particular place based upon his or her training and experience without evidence that corroborates a tip that criminal activity has occurred or is occurring at a particular location, does not establish probable cause for the issuance of a search warrant. The decision of the existence of probable cause to issue the warrant lies in the hands of the magistrate or judicial official entrusted with that determination.

[29]   Clearly, there is a level of respect accorded those who have extensive training in these kinds of investigations. However, there must be evidence of criminal activity presented to the magistrate to establish probable cause to justify the issuance of the warrant. We decide this appeal entirely cognizant of law enforcement's ultimate finding of a considerable, active, marijuana grow operation, which is in violation of our state laws. Nevertheless, finding that the evidence of probable cause to support a search utilizing a thermal imaging scanner was lacking, we are constrained to reverse McGrath's conviction.

# Conclusion

[30]     In light of the foregoing, we reverse and remand the decision of the trial court.

[31]     Reversed and remanded.

[32]     Crone, J., concurs.

[33]     Bradford, J., dissents with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

Brandon McGrath,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

Court of Appeals Case No.
49A04-1610-CR-2270

**Bradford, Judge, dissenting.**

I respectfully disagree with the majority's disposition of this case. Without reaching the question of probable cause, I believe at the very least that the good faith exception applies to render the evidence collected from McGrath's residence admissible. Consequently, I respectfully dissent.

> [T]he exclusionary rule does not require the suppression of evidence obtained in reliance on a defective search warrant if the police relied on the warrant in objective good faith. *United States v. Leon*, 468 U.S. 897, 922, 104 S. Ct. 3405, 3420, 82 L. Ed. 2d 677, 698 (1984); [*Jaggers v. State*, 667 N.E.2d 180, 184 (Ind. 1997)]. The good faith exception has been codified at Indiana Code § 35-37-4-5(a), which provides that "the court may not grant a motion to exclude evidence on the grounds that the search or seizure by which the evidence was obtained was

unlawful if the evidence was obtained by a law enforcement officer in good faith."

….

The good faith exception cannot be so broadly construed as to obliterate the exclusionary rule. *Dolliver v. State*, 598 N.E.2d 525, 529 (Ind. 1992). Accordingly, certain police conduct does not qualify for this exception, including where: (1) the magistrate is misled by information in the affidavit that the affiant either knew was false or would have known was false except for his reckless disregard for the truth, or (2) the warrant was based on an affidavit so lacking in indicia of probable cause as to render belief in its existence unreasonable. *Jaggers*, 687 N.E.2d at 184 (citing *Leon*, 468 U.S. at 923, 104 S. Ct. at 3421, 82 L. Ed. 2d at 699); [*State v. Johnson*, 669 N.E.2d 411, 412 (Ind. Ct. App. 1996), *trans. denied*].

*Newby v. State*, 701 N.E.2d 593, 602-03 (Ind. Ct. App. 1998).

# I. The FLIR Warrant

[35] Here, the record clearly supports the conclusion that the police acted in good faith in executing the FLIR warrant. I acknowledge, as does the majority, the extreme care exercised by law enforcement during the investigation in this case. There is no suggestion that any information set forth by Detective Buckner in his affidavit is false, much less that he knew it to be false or showed reckless disregard for the truth. McGrath's entire argument seems to be that Detective Buckner's affidavit was incomplete, and therefore apparently impermissibly misleading, by failing to note that other houses in the area had both central and auxiliary air-conditioning units and/or window coverings of some sort.

[36] While it is true that "when there is a material omission of fact, this amounts to deliberate, reckless, or grossly negligent conduct[,]" *Hayworth v. State*, 904 N.E.2d 684, 699 (Ind. Ct. App. 2009), McGrath has not established that any omission was material. First and foremost, the fact that some of the things Detective Buckner observed can have innocuous explanations does nothing to undercut the fact that dark window coverings and additional air conditioning units are, in fact, indications of illegal activity, which McGrath does not dispute. Second, very few, if any, of the nearby houses' windows appear to have "dark coverings," as on McGrath's house. (Defendant's Ex. D). Because it may be inferred that Detective Buckner is referring to window coverings intended to block all light, coverings that are not completely opaque are not suspicious, and one would not expect Detective Buckner to mention them, even if he had noticed them on other houses. Last, Detective Buckner was responding to a report of possible illegal activity at one address; his failure to examine the entire neighborhood for other houses with window coverings or suspiciously excessive air conditioning did not show a reckless disregard for the truth. The record does not support a conclusion that the magistrate was misled by Detective Buckner by any alleged omissions. I would conclude that police relied on the FLIR warrant in good faith.

## II. The Second Warrant

[37] McGrath also contends that the warrant to search McGrath's house, obtained by Detective Buckner using the results of the FLIR inspection conducted by

Detective Condon and Sergeant Andresen, was so lacking in indicia of probable cause as to render belief in its existence unreasonable. McGrath specifically argues that Detective Buckner's affidavit is defective because it did not describe Detective Condon's qualifications or experience or the FLIR system in sufficient detail. Detective Buckner averred in his application for the second warrant that Detective Condon told him that, based on Detective Condon's experience and training, the heat signature from McGrath's house was consistent with a marijuana-growing operation. As a general proposition, it is well-settled that "as long as participating officers seeking the issuance of a search warrant collectively have probable cause, their individual knowledge can be imputed to the officer signing the affidavit in support of the search warrant." *Utley v. State*, 589 N.E.2d 232, 236 (Ind. 1992). As such, there is nothing about reliance on the expertise of fellow police officers that undercuts probable cause.

[38] McGrath points to no authority for the proposition that Detective Condon's experience and training should have been spelled out in detail, and I am aware of none. Moreover, I believe that it is perfectly reasonable to infer that "Detective Condon" is a fellow police officer of Detective Buckner, especially in the context of the warrant application. Nor is there any authority requiring the FLIR system's operations to be described in detail, as McGrath argues should have been done. In summary, because the second warrant is not so lacking in indicia of probable cause as to render reliance on it unreasonable, police relied on it in good faith. I would affirm the judgment of the trial court

on the basis that the good faith exclusion applies to the two warrants in this case.[7]

---

[7] Because I would decide the case based on the officers' good-faith reliance on the search warrants, I would not reach the question of whether the warrants were, in fact, supported by sufficient probable cause.